UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JAMES GOLDRING and GINA GOLDRING,

                Plaintiffs,

      - against -

DETECTIVE JASON ZUMO, Shield No. 11153,
SERGEANT GREG VALLERUGO, Shield No. 2315,
DETECTIVE WILLIAM CONNICK, Shield No. 1601,
P.O. GONZALEZ, P.O. JARED HOSPEDALES,
Shield No. 3299, P.O. PERULLO, Shield No. 5188,
P.O. RIVERA, Shield No. 15436, P.O. RIPA, Shield
No. 75264, P.O. STALLONE, Shield No. 15897,
P.O. CRUZ, Shield No. 3657, P.O. KERNY,
P.O. POST, Shield No. 2069, P.O. CARBONE,
P.O. DILLON SHIMANSKY, Shield No. 12499,
P.O. SHORE, P.O. MATTHEW VORRARO,
Shield No. 15194, P.O. "JOHN DOES" 1-6 and
THE CITY OF NEW YORK,

                Defendants.
-------------------------------------------------------------------X

COMPLAINT AND
JURY TRIAL DEMAND

      Plaintiffs, JAMES GOLDRING and GINA GOLDRING, by their attorney, ALAN D.

LEVINE, ESQ., complaining of the defendants herein, respectfully allege as follows:

## JURISDICTION

      1.     This is a civil action, seeking compensatory damages, punitive damages

and attorney's fees.

      2.     This action is brought pursuant to 42 U.S.C. §§1983 and 1988 and the

fourth and fourteenth amendments to the Constitution of the United States.

      3.     Jurisdiction is founded upon 28 U.S.C. §§1331 and 1343.

## VENUE

4.      Venue is properly alleged in the Eastern District of New York in that the acts complained of herein occurred within this District.

## JURY TRIAL DEMAND

5.      Plaintiffs hereby demand a trial by jury of all issues in this action that are so triable.

## PARTIES

6.      At all times relevant hereto, plaintiff JAMES GOLDRING was and is a natural person, resident in the County of Queens, State of New York.

7.      At all times relevant hereto, plaintiff GINA GOLDRING was and is a natural person, resident in the County of Queens, State of New York.

8.      At all times relevant hereto, plaintiffs JAMES GOLDRING and GINA GOLDRING were and are husband and wife.

9.      At all times relevant hereto, defendant DETECTIVE JASON ZUMO, Shield No. 11153 (hereinafter "ZUMO") was and is a natural person, employed as a detective by defendant CITY OF NEW YORK.

10.     At all times relevant hereto, defendant SERGEANT GREG VALLERUGO, Shield No. 2315 (hereinafter "VALLERUGO") was and is a natural person, employed as a sergeant by defendant CITY OF NEW YORK.

11.     At all times relevant hereto, defendant DETECTIVE WILLIAM CONNICK, Shield No. 1601 (hereinafter "CONNICK") was and is a natural person, employed as a detective by defendant CITY OF NEW YORK.

12. At all times relevant hereto, defendant P.O. GONZALEZ (hereinafter "GONZALEZ") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

13. At all times relevant hereto, defendant P.O. JARED HOSPEDALES, Shield No. 3299 (hereinafter "HOSPEDALES") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

14. At all times relevant hereto, defendant P.O. PERULLO, Shield No. 5188 (hereinafter "PERULLO") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

15. At all times relevant hereto, defendant P.O. RIVERA, Shield No. 15436 (hereinafter "RIVERA") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

16. At all times relevant hereto, defendant P.O. RIPA, Shield No. 75264 (hereinafter "RIPA") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

17. At all times relevant hereto, defendant P.O. STALLONE, Shield No. 15897 (hereinafter "STALLONE") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

18. At all times relevant hereto, defendant P.O. CRUZ, Shield No. 3657 (hereinafter "CRUZ") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

19.     At all times relevant hereto, defendant P.O. KERNY (hereinafter "KERNY") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

20.     At all times relevant hereto, defendant P.O. POST, Shield No. 2069 (hereinafter "POST") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

21.     At all times relevant hereto, defendant P.O. CARBONE (hereinafter "CARBONE") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

22.     At all times relevant hereto, defendant P.O. DILLON SHIMANSKY, Shield No. 12499, (hereinafter "SHIMANSKY") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

23.     At all times relevant hereto, defendant P.O. SHORE, (hereinafter "SHORE") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

24.     At all times relevant hereto, defendant P.O. MATTHEW VORRARO, Shield No. 15194 (hereinafter "VORRARO") was and is a natural person, employed as a police officer by defendant CITY OF NEW YORK.

25.     At all times relevant hereto, defendants P.O. "JOHN DOES" 1-6 were and are natural persons, employed as a police officers by defendant CITY OF NEW YORK.

26.     At all times relevant hereto, defendant CITY OF NEW YORK was and is a municipal corporation, organized and existing pursuant to the laws of the State of New York.

## AS AND FOR A FIRST CAUSE OF ACTION
## AGAINST THE INDIVIDUAL DEFENDANTS
### (42 U.S.C. §1983)

27.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "26" hereinabove as if more fully set forth at length herein.

28.     At all times relevant hereto, plaintiffs resided at 118-17 203rd Street, County of Queens, City and State of New York (hereinafter "subject premises").

29.     On or about May 25, 2012, plaintiff JAMES GOLDRING was in the process of moving two rifles and a shotgun that he owned, but for which he did not possess permits, from a closet in the subject premises to a garage located in back of the subject premises.

30.     As plaintiff JAMES GOLDRING was walking through the kitchen of the subject premises in order to get to the back door, he accidentally discharged one of the aforementioned weapons.

31.     The aforementioned discharge resulted in plaintiff JAMES GOLDRING's fourteen-year-old son being wounded.

32.     Plaintiff JAMES GOLDRING immediately telephoned 911 and reported the aforementioned accident.

33.     Plaintiff JAMES GOLDRING left the weapon that he had fired, together with the empty shell casing from the discharge, in the kitchen of the subject premises. However, he put the other two weapons upstairs, under a mattress in the bedroom that he shares with plaintiff GINA GOLDRING.

34.      Within approximately five minutes after his having made the 911 call, defendants ZUMO, VALLERUGO and DOES 1-3 arrived at the subject premises.

35.      The aforementioned individual defendants entered the subject premises through the front door, which plaintiff JAMES GOLDRING had intentionally left open for them.

36.      Plaintiff JAMES GOLDRING related the account of the shooting to the aforementioned individual defendants but did not tell them of the existence of the two other weapons that he had placed under his mattress.

37.      Defendants ZUMO and VALLERUGO transported plaintiff JAMES GOLDRING to the stationhouse of the 113th Precinct.

38.      Upon arrival at the stationhouse of the 113th Precinct, plaintiff JAMES GOLDRING was taken upstairs to the detectives' squad area where he was questioned by defendants ZUMO and VALLERUGO.

39.      Defendants ZUMO and VALLERUGO requested plaintiff JAMES GOLDRING's permission to search the subject premises.

40.      Plaintiff JAMES GOLDRING telephoned plaintiff GINA GOLDRING, who was present at Long Island Jewish Hospital with the wounded boy, and told her that he was being questioned and that he been asked to give permission for the police to reenter the home.

41.      Plaintiff GINA GOLDRING instructed him to stop speaking to the detectives, to deny them permission to re-enter the subject premises and to invoke his right pursuant to the fifth amendment to speak to an attorney.

42.    Plaintiff  JAMES  GOLDRING  informed  defendants  ZUMO  and VALLERUGO that he wished to stop speaking until an attorney was present and that he did not want police officers in the subject premises.

43.    In response to plaintiff JAMES GOLDRING's aforementioned statement, defendant VALLERUGO stated, "So you're lawyered up.  All bets are off.  We're tossing your house and arresting your wife."

44.    Plaintiff JAMES GOLDRING was also told that the officers intended to "tear holes in your walls."

45.    Plaintiff JAMES GOLDRING was placed in a cell.

46.    Defendants DOES 1-3 had remained in the subject premises when plaintiff JAMES GOLDRING was transported to the stationhouse of the 113th Precinct.

47.    While she was at Long Island Jewish Hospital, plaintiff GINA GOLDRING was questioned by defendant CONNICK.

48.    Plaintiff GINA GOLDRING left the hospital at approximately 6:00 A.M. on May 26, 2012.

49.    After leaving the hospital, she drove past the subject premises and observed that the house was wide open, all the interior lights were on, and police officers were present inside.

50.    Upon noticing the aforementioned situation in the subject premises, plaintiff GINA GOLDRING telephoned defendant CONNICK, who told her that defendants DOES 1-3 were present merely for the purpose of securing the subject premises.

51.     Plaintiff GINA GOLDRING replied to defendant CONNICK that the subject premises should be secured from the outside and that the officers should leave and not return until they had obtained a search warrant.

52.     Defendant CONNICK replied that the officers had a right to be in the subject premises because they were processing a crime scene.

53.     Despite her request to enter the subject premises, plaintiff GINA GOLDRING was kept out.

54.     Plaintiff GINA GOLDRING called the 113th Precinct at noon to find out when she would be let back into the subject premises but received no information.

55.     Plaintiff GINA GOLDRING called back between 4:00 P.M and 5:00 P.M., at which time defendant CONNICK informed her that the officers were almost finished with what they were doing inside the subject premises.

56.     On or about May 27, 2012, a relative of plaintiffs, who resided in the basement, was permitted to enter the subject premises.

57.     The aforementioned relative observed that the entire basement of the subject premises had been trashed, that all the windows in plaintiff GINA GOLDRING's motor vehicle had been opened, that the floor mat therein had been pulled back and that there were indications that plaintiff JAMES GOLDRING's vehicle had been searched.

58.     Plaintiff GINA GOLDRING requested that her mother and a male friend of her mother's enter the subject premises to obtain her and her five-year-old child's clothing.

59. Plaintiff GINA GOLDRING's mother and her male companion entered the subject premises and found it to be in complete disarray.

60. During the time they were present in the subject premises, the individual defendants hereto who conducted the search, identified herein as P.O. "JOHN DOES" 1-6, intentionally and maliciously caused the damage enumerated hereinbelow:

- $680 in cash was taken from the house;

- plaintiff JAMES GOLDRING's driver's license was removed;

- a straight razor was taken from the house;

- the lock on the sectional couch was broken and the seat thereof was torn;

- some of the plaintiffs' five-year-old daughter's toys were crushed;

- the five-year-old's computer tablet was cracked;

- plaintiff GINA GOLDRING's muffin maker was broken;

- plaintiffs' Polaroid picture developer was broken;

- steaks and fish were removed from the freezer, thrown on the dining room carpet and left to rot, thereby becoming infested with maggots;

- groceries, such as breakfast cereal, that had been stored on the kitchen counter, were spilled onto the floor;

- clothes from all over the house were thrown onto the dining room floor and left there;

- a jar containing cinnamon was emptied onto the kitchen counter;

- three or four plates were broken;

- food that had been left in the kitchen sink at the time that plaintiff JAMES GOLDRING accidentally shot his son, was allowed to remain in the kitchen sink, thereby becoming infested with maggots;

- all of the family's cookware was thrown onto the kitchen floor;

- garbage from the kitchen was carried up to the second floor of the house and dumped on the floor of the five-year-old's bedroom;

- the five-year-old's bed was broken;

- the television in the five-year-old's bedroom was broken;

- sexually oriented merchandise sold by plaintiff GINA GOLDRING in a part-time job for a company named Passion Parties was removed from plaintiffs' bedroom and placed in plain view in the five-year-old's room;

- the box spring and mattress of plaintiffs' bed were cut open;

- plaintiff JAMES GOLDRING's X-Box was smashed;

- the cable television line was cut;

- cigarette butts were tossed into the cat litter in plaintiffs' bathroom;

- the nightlight in the bathroom was destroyed;

- plaintiffs' toothbrushes were thrown onto the bathroom floor;

- the arm of plaintiff JAMES GOLDRING's turntable, which he kept in the attic of the subject premises, was broken;

- a mixer that was in the attic was broken;

- plaintiff JAMES GOLDRING's train set, also kept in the attic, was broken;

- the front door and the side door of the subject premises were ripped off their hinges;

- the front gate to the subject premises was damaged;

- the carpet in plaintiff GINA GOLDRING's motor vehicle was cut.

61.   Plaintiff GINA GOLDRING was arrested on June 14, 2012, and was charged with two felonies, four misdemeanors and one violation.

62.   While plaintiff GINA GOLDRING was being held at the stationhouse of the 113th Precinct, her asthma inhaler was taken from her and was purposely and maliciously emptied by defendant VORRARO.

63.   Ultimately, plaintiff GINA GOLDRING pleaded guilty to disorderly conduct, a violation.

64.   Plaintiff JAMES GOLDRING ultimately pleaded guilty to endangering the welfare of a child and was sentenced to thirty days of community service.

65.   Subsequent to his arrest, plaintiff JAMES GOLDRING was subjected to an unremitting campaign of harassment by police officers assigned to the 113th Precinct, maliciously aimed at harming his business.

66.   On July 25, 2012, at approximately 9:19 P.M., five police officers from the 113th Precinct entered plaintiff JAMES GOLDRING's barbershop, allegedly to inspect his business and professional licenses.

67.   On or about July 25, 2012, a customer of plaintiff JAMES GOLDRING, who was standing outside the barbershop and smoking while he was waiting to have his hair cut, was arrested for loitering.

68.   On July 27, 2012, at approximately 5:48 P.M., a sergeant and a plainclothes officer from the 113th Precinct entered plaintiff JAMES GOLDRING's barbershop and examined the same licenses that had been examined two days before.

69.     On   or   about   December   28,   2012,   defendants   GONZALEZ, HOSPEDALES, PERULLO, RIVERA, RIPA, STALLONE, CRUZ, KERNY and POST entered plaintiff JAMES GOLDRING's barbershop, allegedly to examine his licenses.

70.     On that occasion, plaintiff JAMES GOLDRING was issued three summonses by defendant POST, one for failure to display his barber's license, a violation of New York State General Business Law §439(3); one for having unswept hair on the floor of his barbershop, a violation of New York City Health Code §163.11(a); and the other for failure to display the address of his barbershop on the front door, a violation of New York City Administrative Code §3-505.   All of the aforementioned charges were ultimately dismissed.

71.     On or about February 14, 2013, at approximately 9:00 P.M., a customer of plaintiff JAMES GOLDRING's barbershop, Levon Sims, who had just come out of the shop, was stopped and questioned by five police officers traveling in three unmarked cars.

72.     The aforementioned officers told Mr. Sims that they had stopped him because he had come out of the shop of plaintiff JAMES GOLDRING, who, they said, was a known criminal and further told Mr. Sims that the shop was known to be a place of criminal activity.

73.     On or about February 22, 2013, at approximately 8:00 P.M., defendants CRUZ, POST, RIPA, CARBONE, SHIMANSKY and SHORE entered plaintiff JAMES GOLDRING's barbershop.

74.     On that occasion, defendant RIPA issued three summonses to plaintiff JAMES GOLDRING, one for an unswept floor, one for an uncovered garbage can and

one for the presence of paper towels that had not been thrown into the garbage can, all violations of the New York City Health Code.  All of the aforementioned charges were ultimately dismissed.

75.    On or about April 25, 2013, several officers assigned to the 113th Precinct entered plaintiff JAMES GOLDRING's barbershop at a time when he was not present.

76.    There were two barbers present in the premises at the aforementioned time.

77.    The aforementioned police officers demanded the licenses of the aforementioned barbers and then issued four summonses to each of them, charging them with having hair on the floor of the shop, not having a cover on the garbage can, not having an address on the front door of the premises and not having licenses displayed.

78.    As a result of the constant harassment from defendants and other officers assigned to the 113th Precinct, plaintiff JAMES GOLDRING's barbering business began to suffer.

79.    Plaintiff JAMES GOLDRING's barbershop lost customers and employees.

80.    Ultimately, as a result of the loss of business, plaintiff JAMES GOLDRING fell behind in his rent.

81.    Finally, on or about June 10, 2013, plaintiff JAMES GOLDRING was evicted from his business premises and was forced to close his barbershop.

82.    Defendants violated plaintiffs' rights, pursuant to the fourth amendment to the Constitution of the United States, to be secure in their persons, house, papers and effects against unreasonable searches and seizures and their rights under the

fourteenth amendment to the Constitution of the United States to procedural and substantive due process of law in that, while acting under color of state law, the individual defendants hereto, as described hereinabove, improperly searched plaintiffs' dwelling without having a warrant therefor; maliciously and intentionally damaged and destroyed portions of plaintiffs' dwelling and items of their personal property; falsely arrested plaintiff GINA GOLDRING; and intentionally and maliciously destroyed plaintiff JAMES GOLDRING's business through a pattern of unremitting harassment that consisted of abusing legal process by repeatedly issuing large numbers of summonses for minor or nonexistent violations of the New York State General Business Law, the New York City Health Code and the New York City Administrative Code with the intention, ultimately successful, not of enforcing those statutes and ordinances, but of harming and interfering with plaintiff JAMES GOLDRING's business to the point that it was destroyed.

83.     As a result of the aforementioned violations of rights guaranteed to plaintiffs by the fourth and fourteenth amendments to the Constitution of the United States, the individual defendants hereto caused plaintiffs to suffer extreme mental anguish, caused damage to plaintiffs' dwelling and to their personal property, deprived plaintiff GINA GOLDRING of her liberty and destroyed the business owned and operated by plaintiff JAMES GOLDRING and deprived him of the income he derived therefrom.

84.     As a result of the aforementioned denials of rights guaranteed to plaintiffs by the fourth and fourteenth amendments to the Constitution of the United States, the individual defendants have damaged plaintiffs in an amount sufficient to compensate

them for their injuries as enumerated hereinabove. In addition, plaintiffs seek punitive damages against the individual defendants, both amounts to be determined at the trial of this action.

## AS AND FOR A SECOND CAUSE OF ACTION
## AGAINST DEFENDANT CITY OF NEW YORK
### (42 U.S.C. §1983)

85.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in paragraphs "1" through "84" hereinabove as if more fully set forth at length herein.

86.     Defendant CITY OF NEW YORK, acting through its Police Department and through the individual defendants, maintained policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct alleged herein.

87.     Upon information and belief, defendant CITY OF NEW YORK failed to provide any training to its police officers, either at its Police Academy or in service, either formally or informally, with regard to the constitutional prohibitions on causing unnecessary and excessive damage during the execution of search warrants.

88.     Upon information and belief, defendant CITY OF NEW YORK maintained no written guidelines on the constitutional prohibitions on causing unnecessary and excessive damage during the execution of search warrants.

89.     Defendant CITY OF NEW YORK knew to a moral certainty that its police officers would be required to execute search warrants and empowered them to do so. Therefore, the need to train officers in the constitutional limitations on causing

unnecessary or excessive damage during the execution of a search warrant was obvious.

90.     The failure of defendant CITY OF NEW YORK to train or provide guidelines to its police officers regarding the constitutional prohibitions on causing unnecessary and excessive damage during the execution of search warrants amounts to deliberate indifference to the rights of persons with whom the police come into contact.

91.     Defendant CITY OF NEW YORK implemented, enforced, encouraged, sanctioned and/or ratified policies, practices and/or customs of failing to train its police officers and of failing to implement guidelines on the constitutional prohibitions on causing unnecessary and excessive damage during the execution of search warrants.

92.     By implementing, enforcing, encouraging, sanctioning, and/or ratifying the aforementioned policies, practices and/or customs, defendant CITY OF NEW YORK caused plaintiffs to be subjected to excessive and/or unnecessary destruction of property during the search of their home, and to be deprived of their property without due process of law, in violation of the rights guaranteed to them by the fourth and fourteenth amendments to the Constitution of the United States.

93.     As a result of the foregoing, plaintiffs suffered damage to their dwelling and their personal property and extreme mental anguish.

94.     As a result of the aforementioned denials of the rights guaranteed to plaintiffs by the fourth and fourteenth amendments to the Constitution of the United States, defendant CITY OF NEW YORK has damaged plaintiffs in an amount sufficient to compensate them for their injuries as enumerated hereinabove.

WHEREFORE, plaintiffs, JAMES GOLDRING and GINA GOLDRING, demand judgment against defendants, DETECTIVE JASON ZUMO, Shield No. 11153, SERGEANT GREG VALLERUGO, Shield No. 2315, DETECTIVE WILLIAM CONNICK, Shield No. 1601, P.O. GONZALEZ, P.O. JARED HOSPEDALES, Shield No. 3299, P.O. PERULLO, Shield No. 5188, P.O. RIVERA, Shield No. 15436, P.O. RIPA, Shield No. 75264, P.O. STALLONE, Shield No. 15897, P.O. CRUZ, Shield No. 3657, P.O. KERNY, P.O. POST, Shield No. 2069, P.O. CARBONE, P.O. DILLON SHIMANSKY, Shield No. 12499, P.O. SHORE, P.O. MATTHEW VORRARO, Shield No. 15194, P.O. "JOHN DOES" 1-6 and THE CITY OF NEW YORK, as follows:

FIRST CAUSE OF ACTION:  An amount sufficient to compensate them for their injuries as enumerated hereinabove and, in addition, punitive damages against the individual defendants, both amounts to be determined at the trial of this action; and

SECOND CAUSE OF ACTION:  An amount sufficient to compensate them for their injuries as enumerated hereinabove.

In addition, plaintiffs demand the costs and disbursements of this action, including their attorney's fees, pursuant to 42 U.S.C. §1988.


Dated:  Kew Gardens, New York
        August 14, 2014

ALAN D. LEVINE, ESQ.
Attorney for Plaintiffs
80-02 Kew Gardens Road, Suite 302
Kew Gardens, New York 11415
(718) 793-6363
Our File No. 2251